UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

UNITED STATES OF AMERICA,      )
                               )
                               )            2:18-CR-160
            Plaintiff,         )
                               )
     vs.                       )
                               )
NICHOLAS NASSIF HAYEK,         )
                               )
            Defendant.         )
                               )

## REPORT AND RECOMMENDATION

Before the Court is Defendant's Motion to Suppress [Doc. 79] in which he seeks the suppression of statements he made to law enforcement officers during an interview on October 1, 2018. The United States filed a Response in Opposition to Defendant's Motion [Doc. 93]. The Court conducted an evidentiary hearing on the motion on June 14, 2021. Defendant and his counsel, Timothy Hunter Shelton, Esq., Michael Curtis Collins, Esq., and Corey B. Shipley, Esq., along with Assistant United States Attorneys Meghan Gomez, Esq. and J. Gregory Bowman, Esq. were present for the hearing. Special Agent Jennifer L. Weidlich of the Federal Bureau of Investigation ("FBI"), FBI Task Force Officer Brian Bisceglia, and Defendant testified at the hearing.[1]

This matter is before the Court pursuant to 28 U.S.C. § 636(b) and the standing orders of the District Court for a Report and Recommendation. For the reasons stated herein, the undersigned **RECOMMENDS** that the Motion to Suppress [Doc. 79] be **DENIED**.

---

[1] Agent Weidlich and Officer Bisceglia testified via video by agreement of the parties. *See United States v. Burke*, 345 F.3d 416, 424-26 (6th Cir. 2003) (holding that the use of two-way video conferencing during pre-trial suppression hearings does not violation a defendant's right to due process or confrontation).

# I.     BACKGROUND

On October 10, 2018 a federal grand jury returned an Indictment [Doc. 5] against Defendant charging him with one (1) count of knowingly enticing or attempting to entice a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b); one (1) count of knowingly persuading or attempting to persuade a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct, in violation of 18 U.S.C. § 2251(a) and (e); one (1) count of knowingly transferring obscene matter to another individual who had not attained the age of sixteen years, in violation of 18 U.S.C. § 1470. Defendant filed the instant Motion [Doc. 79] on May 26, 2021, arguing that the statement Defendant gave to law enforcement on October 1, 2018 should be suppressed because Defendant did not waive his *Miranda* rights voluntarily, knowingly, and intelligently.

After Defendant filed the initial motion, a federal grand jury returned a Superseding Indictment [Doc. 82] against Defendant charging him with the same offenses contained in the original Indictment as well as one (1) count of knowingly receiving child pornography as defined in 18 U.S.C. § 2256(8) that had been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) and one (1) count of knowingly possessing or accessing with the intent to view matter that contained an image of child pornography as defined in 18 U.S.C. § 2256(8) involving a prepubescent minor or minor who had not attained 12 years of age that had been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). As a result of the Superseding Indictment, Defendant was given an opportunity to file a supplement to his original motion but determined that no supplementation was necessary.

## II.  FINDINGS OF FACT

### a.  Testimony of Special Agent Jennifer Weidlich

Special Agent Jennifer Weidlich ("Agent Weidlich"), an FBI special agent stationed in Worcester, Massachusetts, advised during her testimony that she holds a Bachelor of Arts degree from the University of Delaware in criminal justice and psychology and a law degree from Widener University. Before joining the FBI, she worked as a probation and parole officer for seven years and as a law clerk for the Superior Court of Delaware for two years. Agent Weidlich has been a special agent with the FBI for 17 years and has specialized in internet crimes against children throughout that time. Agent Weidlich testified that she completed a basic crimes against children training course and specialized software training, and has routinely participated in other training throughout her 17-year career with the FBI. Additionally, she is a certified undercover agent and a member of the Boston Child Exploitation and Human Trafficking Task Force, which is comprised of members of the FBI, the Department of Homeland Security ("DHS"), the Worcester Police Department ("Worcester PD"), and the Massachusetts State Police.

Agent Weidlich acknowledged in direct testimony that she has been subject to disciplinary action once during her career with the FBI. She explained that she was suspended in March 2021 for lack of candor because she denied a personal relationship with another FBI agent when questioned about it by her supervisor in the presence of several other agents and members of the public. Agent Weidlich testified she later called her supervisor and admitted to the relationship and that the relationship itself was not against policy. Agent Weidlich testified that after her suspension she was able to resume working as a case agent and serving as an affiant for the purpose of seeking warrants from the Court. She also continues to work as a special agent on cases involving internet crimes against children.

Agent Weidlich testified she became involved in the investigation of Defendant when she received a lead from Special Agent Bianca Pearson ("Agent Pearson") in the Knoxville, Tennessee FBI office. Agent Pearson advised her that Defendant and the alleged victim were chatting and exchanging images via Kik, an instant messaging mobile app. The FBI then obtained a search warrant for Defendant's home and a criminal complaint and arrest warrant for Defendant himself. Agent Weidlich testified that surveillance of Defendant's residence was conducted prior to executing the search warrant in accordance with standard procedure which allows agents to accurately determine the location of the residence and number of occupants. Agent Weidlich further explained that the number of occupants has a direct bearing on the number of law enforcement personal needed to conduct a search and interview occupants of the residence. Typically, two agents speak with each resident and additional personnel is required to continue the search while interviews are ongoing. Additionally, she advised that when the search area is large utilizing a larger number of law enforcement officers allows the search to be completed faster with as little inconvenience to residents as possible.

Agent Weidlich testified that approximately 17 law enforcement agents were present to execute the search warrant on Defendant's residence at approximately 6:15 a.m. on October 1, 2018. As referenced above, the search team was comprised of members of the FBI, the Massachusetts State Police, the Worcester PD, DHS and the Leominster Police Department. The large number of agents was due primarily to the size of the home and number of occupants. Agent Weidlich stated it is typical for search warrants to be executed early in the morning because people are generally home at that time before leaving for work or school. Agent Weidlich testified that agents knocked on the door and waited for someone to answer. She stated there was no SWAT team present, that agents did not enter with their weapons drawn, and that none of the agents were

carrying rifles. A person Agent Weidlich believes was Defendant's uncle answered the door and agents then entered the home. Once inside, the agents located all occupants and, for safety, brought them to a common area, in this case the downstairs living area.[2] Agent Weidlich testified she thought Defendant was asleep when law enforcement entered the home but did not recall who woke him. She stated Defendant was in his room with two other agents for some period of time before she entered the room to conduct an interview.

Defendant was interviewed by Agent Weidlich and her partner, Task Force Officer Brian Bisceglia ("Officer Bisceglia"), shortly after 7:00 a.m. Agent Weidlich testified that it is routine for agents to identify a quiet location within which to conduct such interviews. In this case, Defendant was interviewed in his bedroom at his request so that he was not in the presence of his family and the interview was recorded. Agent Weidlich stated Defendant asked what his rights were before the interview and she read his *Miranda* rights to him, which he appeared to understand. Defendant did not ask any questions about his rights and signed a written waiver of those rights.[3]

The door to Defendant's bedroom was closed during the interview, and Agent Weidlich testified that she was in close proximity to Defendant. She stated she did not smell any alcohol and does not recall seeing any open alcohol or juice containers in Defendant's room. Agent Weidlich also testified that she did not recall Defendant mentioning that he had been drinking or was impaired at any point during the interview and nothing about his demeanor led her to think he was in fact impaired. Agent Weidlich admitted that she does not have specialized training in recognizing signs of impairment but stated she has seen impaired people before and is confident she could tell if a person was impaired based on her lay experience.

---

[2] Defendant was not brought downstairs at this time.
[3] The audio recording of Defendant's interview along with a transcript of the interview created by the FBI and the signed *Miranda* waiver form were entered as exhibits to the suppression hearing.

Defendant told Agent Weidlich and Officer Bisceglia he was attending college at Fitchburg State and was interested in law. Agent Weidlich testified that Defendant was asked standard questions regarding phone numbers, email addresses, passwords, etc. and was able to provide a significant amount of this type of information with no difficulty. She stated Defendant even joked about some of the usernames and email addresses he had chosen.

The interview of Defendant lasted approximately one hour. Agent Weidlich testified that she did not yell or make threats during the recorded interview or before the interview began and that Defendant was offered a break during the interview, but he declined. She further testified that Defendant did not ask to speak to his family or express any concerns about his family other than asking to be interviewed away from them. She stated Defendant did not ask for a lawyer or invoke any of his *Miranda* rights at any time, but admitted she was not with Defendant the entire time agents were inside the home so it is possible the told another agent he wanted a lawyer but stated that such a request would have been relayed to her as the lead agent. Agent Weidlich testified that she did not inquire about the immigration status of Defendant's family or make any reference to deporting Defendant's family if he did not speak to law enforcement and to her knowledge no other agents made such statements. Agent Weidlich advised that only one member of the search team was a DHS agent and that this agent was there as a forensic examiner rather than on behalf of DHS's immigration division. Agent Weidlich testified she was aware that Defendant and his family were Lebanese prior to the search and stated she knew Defendant's father was previously deported from the United States but was unable to remember if she learned of that fact before or after the search.

Approximately halfway through the interview Defendant admitted to exchanging pictures of a sexual nature with a ten-year-old girl through Kik. Defendant identified the username he used

to exchange messages and photographs with the alleged victim and identified specific messages and photographs that were exchanged. At the conclusion of the interview Defendant was arrested. He was handcuffed while still in his bedroom and then walked downstairs and out of the house. Agent Weidlich testified she did not recall Defendant stumbling or needing assistance while walking down the stairs.

### b. Testimony of Task Force Officer Brian Bisceglia

Officer Bisceglia is a 25-year law enforcement veteran, has been a member of the Boston Child Exploitation and Human Trafficking Task Force for more than five years, and is assigned to work on cases involving the exploitation of children. Officer Bisceglia is currently a detective sergeant in the cybercrimes' unit of the Worcester PD, where he has worked for approximately 20 years. He also served as a member of the Holden, Massachusetts Police Department for approximately five years. Officer Bisceglia has a bachelor's degree in electronic engineering technology, a master's degree in applied computer science and is currently pursuing a PhD in information assurance. Officer Bisceglia testified that he has received continuing education in digital forensics throughout his law enforcement career and that one of his job duties is forensic examination of various digital devices used in the exploitation of children. Additionally, Officer Bisceglia spent part of his prior experience in law enforcement as a patrol officer and has training and experience in recognizing signs of intoxication.

Officer Bisceglia stated he routinely works closely with Agent Weidlich and worked with her on Defendant's case as well. He testified that he was present and assisted in serving the search and arrest warrants on Defendant at his residence on October 1, 2018. Officer Bisceglia could not recall the specific number of additional agents who participated in the search, but FBI policy is that there should be at least eight or more agents and that number may increase depending on

various factors, such as the number of persons present at the location to be searched, the type and amount of technology subject to search, etc. Officer Bisceglia testified that when agents arrived at Defendant's home to execute the search warrant there was a "knock and announce" and someone answered the door. He stated that he was carrying a handgun which was not drawn and did not recall any of the other agents having their weapons drawn, although he agreed that it is not uncommon for law enforcement to display firearms during a search, especially upon entry into a home. Officer Bisceglia testified there was no SWAT team present, but there were multiple agents trained in forensics who took part, one of whom was a DHS agent.

Officer Bisceglia advised that he entered Defendant's room with Agent Weidlich and thinks Defendant was sleeping and had to be awakened. Additionally, Officer Bisceglia noted that he did not smell alcohol or notice any open containers in Defendant's room, nor did he recall seeing any cold medicine. Officer Bisceglia further testified he did not notice any signs of intoxication in Defendant and found Defendant to be intelligent and articulate during the interview. He stated there was nothing about Defendant's behavior or demeanor that indicated Defendant did not have the ability to understand what was happening. Officer Bisceglia was unsure of how much time elapsed between when agents arrived at Defendant's residence and when they began interviewing him. He testified that he did not speak to anyone in the home, including Defendant, about immigration issues or make any immigration-related threats. Specifically, Officer Bisceglia denied telling Defendant that his family's immigration papers would be checked if he did not speak to law enforcement. Officer Bisceglia also testified that he did not hear any other law enforcement agents mention immigration or make immigration-related threats but conceded it is possible that such statements could have been made by other agents at some point outside of his hearing. Officer

Bisceglia acknowledged his awareness that Defendant's father was previously deported but was unsure when he first became aware of this information.

Officer Bisceglia participated in the interview of Defendant in Defendant's bedroom along with Agent Weidlich. Officer Bisceglia testified that he was present when Agent Weidlich advised Defendant of his *Miranda* rights, observed Defendant sign a *Miranda* waiver form, and then signed the form himself as a witness. Officer Bisceglia testified that no one yelled at Defendant during the interview. He further stated that Defendant provided appropriate answers to the questions asked and was cooperative, even volunteering unsolicited information at times during the interview. Officer Bisceglia did not recall the audio recording being stopped at any point during the interview nor Defendant asking to use the bathroom or otherwise take a break during the interview. Officer Bisceglia testified that it is possible Defendant could have told other agents he wanted a lawyer or needed to go to the bathroom before the interview commenced, but Officer Bisceglia did not hear Defendant make those statements.

### c.  Audio Recording and Transcript of Defendant's Statement

The audio recording and transcript of Defendant's statement were tendered to the Court prior to the hearing and the parties agreed on the record that it was unnecessary to play the recording of Defendant's interview during the hearing. The Court reviewed the recording and transcript of Defendant's interview and finds them to be consistent with the testimony of Agent Weidlich and Officer Bisceglia. According to the time stamp on the recording, Defendant's interview commenced at 7:06 a.m. on October 1, 2018 and lasted one hour and thirty-two minutes.

The Court notes that Defendant sounded alert and spoke clearly without slurring or stumbling over words during the interview. His voice was calm and not shaky. Of particular note to the Court was the fact that Defendant was able to provide detailed information regarding a

variety of email and social media accounts as well as specific information regarding the make and model of cell phones and the associated PIN numbers and passcodes and wireless service providers he used during various periods of time. In fact, Defendant even made remarks of a joking nature related to some of his prior username choices.

Defendant did not mention consuming or being under the influence of alcohol or medication during his statement, nor did he express any confusion about or ask for any clarification regarding his *Miranda* rights. When Defendant asked what his rights were at the beginning of the recording, he was verbally advised of his rights and replied "sure" when asked if he was willing to speak with agents. Defendant even went further and explained his decision by stating that it is "better to be open." Defendant was further advised that he could terminate the interview at any time. After choosing to provide his statement, Defendant gave coherent and appropriate answers to the agents' questions throughout the interview and offered technical explanations regarding various websites and internet servers. Additionally, Defendant was asked if he needed to take a break and said that he did not, and even offered to continue speaking with agents when they advised him that they did not have any more questions and were ready to end the interview.

The Court further notes that the immigration status of Defendant and his family was never mentioned or alluded to during the interview. Defendant even asked during the interview process if everyone else in the house was "getting the same interrogation" and Officer Bisceglia advised that they were. Defendant expressed no concern at that time about whether the subject matter of those "interrogations" included immigration.

### d. Testimony of Defendant

Defendant[4] testified that he lives in Leominster, Massachusetts with his parents, aunt, uncle, two cousins and grandmother in the same home which was searched by law enforcement on October 1, 2018. Defendant testified that he worked with his father selling cars on September 30, 2018 and arrived home at approximately 9:00 p.m. He stated that once he arrived at home he decided to celebrate, by drinking alcohol, the fact that he and his father had secured a location to open their own car business and were going to start working on getting the business ready to open the following day. Defendant testified that he mixed vodka and mango juice by pouring about one-fourth of a "regular-sized large" bottle of vodka into a large bottle of mango juice. Defendant testified that he drank until 2:00 or 3:00 a.m. but did not go to sleep when he stopped drinking. He also stated that he took NyQuil at approximately 1:00 a.m. but continued to drink alcohol after taking it. Defendant testified that he has taken NyQuil many times before because he has insomnia and it makes him sleep. He further stated that when he takes NyQuil he is extremely lethargic the next morning and can "barely process" and often has a "full-blown headache," especially when he takes NyQuil in addition to drinking alcohol. Defendant also testified that when he takes NyQuil and has early morning college classes the following day he still goes to class.

It is unclear from Defendant's testimony what time he fell asleep, but he testified that he was awakened on the morning of October 1, 2018 by the sound of heavy footsteps and the door to his room opening. He heard a female voice say his name and realized that it was not his mother waking him up for college; however, on cross examination Defendant stated he could not recall if he had school that morning or even if he had Monday classes during that semester. Defendant also

---

[4] The Court advised Defendant of his right to remain silent and warned that he would be subject to cross-examination and that anything he said during the hearing could be used against him at trial.

testified on cross examination that his plan for October 1 was to go to the location of the new car business he and his father were starting "later in the afternoon" to begin "setting up" the business. He was unable to say exactly what this would entail, other than painting and whatever else his father said needed to be done. Defendant testified that he put on his glasses and then saw a woman with a gun on her side and three men with rifles pointed at him. Defendant testified he began having a panic attack at this time. He stated he has had panic attacks before and when he suffers from a panic attack he experiences "mental overload" and cannot process things and becomes reactive and defensive, which he described as refusing to talk to anyone and telling people to leave him alone. Defendant was unable to say how long his panic attack lasted.

Defendant testified that he had no idea what was going on in his house outside of his room because he was not allowed to leave his room. Defendant further testified he was still under the influence of alcohol but recalled repeatedly telling the agents in his room that he wanted an attorney. Defendant stated that once he realized Agent Weidlich was a law enforcement agent he refused to speak to her and repeatedly stated that he wanted an attorney. Defendant testified that his refusal to be interviewed and requests for an attorney went on for approximately an hour. Defendant testified that after about an hour Agent Weidlich left the room and came back with a man, who he later learned was Officer Bisceglia. Defendant stated Officer Bisceglia commented that Defendant had a nice house with a nice pool and then commented that Defendant's family were Lebanese immigrants. Defendant testified at that point Officer Bisceglia told Defendant if law enforcement was not able to speak with him that day, they would have to look through his family's "papers and devices." Defendant stated he interpreted these statements as threats to have his family deported if he did not consent to speak with law enforcement.

Defendant testified that once he realized law enforcement agents were in his house it was his intent not to speak with them. However, after Officer Bisceglia made these statements that Defendant interpreted as threats against his family, Defendant prioritized his family over himself and agreed to speak to law enforcement because he was scared for his family. Defendant testified that he would not have spoken to law enforcement but for the "threats" made by Officer Bisceglia. Despite testifying on direct examination that he remembered speaking with Agent Weidlich and Officer Bisceglia, Defendant stated on cross examination that he does not recall his interview and statement to law enforcement. At the same time, Defendant testified with crystal clear recollection of the time leading up to the interview during which he claims he refused to give a statement and requested counsel.

### e. Witness Credibility

The Court finds Agent Weidlich and Officer Bisceglia to be credible witnesses, noting that their testimony was consistent with the recording of Defendant's statement. While there were some minor inconsistencies between the testimony of Agent Weidlich and Officer Bisceglia, this is not unexpected as the events about which they were testifying took place more than two-and-a-half years ago. Moreover, these inconsistencies concern relatively minor details and the substantive portions of their testimonies are consistent with each other.

Both Agent Weidlich and Officer Bisceglia are veteran law enforcement officers with the knowledge and experience necessary to recognize signs of intoxication. Additionally, Agent Weidlich verbally advised Defendant of his *Miranda* rights and obtained a written waiver of *Miranda* rights form from Defendant, which was also signed by both Agent Weidlich and Officer Bisceglia. The Court does not find that Agent Weidlich's suspension for lack of candor in response to a question regarding a personal relationship, especially given that the question was posed in the

presence of fellow officers and members of the public, impacted the credibility of her testimony in this case.

Conversely, the Court does not find Defendant's testimony to be credible. Defendant was conveniently able to remember the period of time between awakened by law enforcement agents entering his room and the beginning of his statement with perfect clarity but claimed to have no memory of speaking with agents or providing a recorded statement at all. He indicated that he learned the content of the statement by listening to the recording. Further, there were notable contradictions between Defendant's testimony and the facts set forth in the instant motion, and significant portions of his testimony were inconsistent with the objective recorded evidence of his statement to law enforcement.

## III.    ANALYSIS

A defendant may waive the rights conveyed in *Miranda* warnings so long as the waiver is made knowingly, voluntarily, and intelligently. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The inquiry to determine whether such a waiver was made consists of two distinct parts: 1) was the waiver voluntary in the sense that it was a deliberate choice rather than the result of intimidation, coercion, or deception; and 2) was the waiver made with full awareness of both the nature of the rights being waived and the consequences of waiver such that the decision was knowingly and intelligently made. *Colorado v. Spring*, 479 U.S. 564, 573-74 (1987) (citing *Moran*, 475 U.S. at 421). The Court must consider the totality of the circumstances surrounding the interrogation when determining whether a waiver was made voluntarily, knowingly, and intelligently. *Id.*; *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009). Specifically, "courts consider the defendant's age, education, intelligence, prior experience with the criminal justice system, the length and nature of the questioning, the advice regarding *Miranda* rights, and the use of physical punishment, such as

deprivation of food or sleep" to determine whether a waiver was knowingly and intelligently made. *United States v. Hampton*, 572 F. App'x 430, 433 (6th Cir. 2014) (citing *Murphy v. Ohio,* 551 F.3d 485, 511 (6th Cir.2009)).

Here, Defendant alleges that his waiver of his *Miranda* rights was neither voluntary nor knowing and intelligent [Doc. 79, p. 3-4]. Defendant asserts that he was under the influence of alcohol and NyQuil and was "unable to properly comprehend what rights he was waiving." *Id.* at p. 4. Further, Defendant argues that even if he was able to understand his *Miranda* rights, any statement he gave "was the product of coercion and duress" because law enforcement threatened the immigration status of Defendant's family if he did not give a statement, effectively giving Defendant an ultimatum and forcing him to choose between his family and speaking to law enforcement. *Id.* at p. 5. To address Defendant's claims, the Court must analyze both whether Defendant had the capacity to waive his *Miranda* rights and, if so, whether such waiver was voluntary. The Court will address each of these questions in turn.

### a. Defendant's Ability to Knowingly and Intelligently Waive *Miranda* Rights

The Court will first address whether Defendant was incapable of knowingly and intelligently waiving his *Miranda* rights due to alleged intoxication and sleep-deprivation. With regard to intoxicated defendants, the Sixth Circuit has noted that factors such as the defendant's "age, experience, education, background, and intelligence, and ... capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights" should be examined. *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010) (quoting *Fare v. Michael C.,* 442 U.S. 707, 725 (1979)). Further, the "question of [a defendant's] incapacitating intoxication, or lack thereof, [is] simply a credibility issue." *Id.* (quoting *United States v. Jones,* No. 90–3693, 1991 WL 105751, at *3 (6th Cir. June 18, 1991)). Importantly, the

Government need only prove a Miranda waiver was made voluntarily, knowingly, and intelligently, by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Additionally, "[t]he underlying police-regulatory purpose of *Miranda* compels that these circumstances be examined, in their totality, primarily from the perspective of the police." *Garner*, 557 F.3d at 263. As explained by the Sixth Circuit, "[t]he knowledge of the police is vital. If they have no reason to think that the suspect doesn't understand them, there is nothing that smacks of abusive behavior." *Id.* at 262 (quoting *Rice v. Cooper*, 148 F.3d 747, 750-51 (7th Cir. 1998)) (internal citations omitted).

Here, Defendant did not exhibit slurred speech or other physical signs of intoxication, nor did the agents observe any open containers of alcohol or medicine bottles in Defendant's room. While Defendant was asleep when agents initially entered the residence, he was quickly awakened and remained awake throughout the interview process with no apparent difficulty. Although Defendant was only 20 years of age and did not have any prior experience with the criminal justice system at the time of the interview, he advised agents that he was a junior in college and was studying pre-law. Additionally, Defendant specifically asked what his rights were and after being advised of his *Miranda* rights waived them both verbally and by signing a written waiver. Defendant did not express any confusion about his rights or ask any questions. Defendant's interview lasted approximately an hour-and-a-half. The recording reflects that Defendant was asked if he needed a break twice, and both times he stated that he did not. During the interview, Defendant was able to readily recall specific and detailed information, including passwords and usernames, that many people would struggle with producing in a stressful situation such as being interviewed by law enforcement without being under the influence of any substance. He provided appropriate answers to the questions posed and remained alert for the duration of the interview.

These circumstances are similar to those of *United States v. Jones.,* No. 90–3693, 1991 WL 105751 (6th Cir. June 18, 1991). In *Jones*, the defendant alleged his *Miranda* waiver could not have been knowing and intelligent due to intoxication. The defendant testified that he was intoxicated to the point of being unable to remember committing the crime with which he was charged, much less giving a confession to law enforcement. *Id.* at *3. At a hearing on his motion to suppress, police witnesses testified that either Jones was not intoxicated at all or in the alternative, that it did not affect his competency or volition. *Id.* The trial court found Jones' statement to be admissible and the Sixth Circuit agreed, holding that the determination of Jones' ability to knowingly and intelligently waive his *Miranda* rights came down to a credibility determination and there was more than ample evidence for a trier of fact to legitimately conclude that Jones knew what he was doing when he waived his *Miranda* rights. *Id.* Moreover, in *United States v. Dunn*, 269 F. App'x 567, 573 (6th Cir. 2008), the Sixth Circuit upheld the trial court's determination that the defendant's *Miranda* waiver was knowingly made despite finding that the defendant was under the influence of Vicodin and marijuana at the time his statement was provided. In *Dunn*, officers testified that the defendant was alert and able to respond to questions, appeared to understand his *Miranda* rights, and an audio recording of the interview revealed that defendant was coherent and lucid. *Id.*

Here, based upon the testimony of Agent Weidlich and Officer Bisceglia as well as the recording of Defendant's interview, the totality of the circumstances demonstrate that Defendant knowingly and intelligently waived his *Miranda* rights. Defendant did not display any outward signs of being unable to understand his rights or an inability to comprehend the consequences of waiving them. The only basis for a finding that Defendant did not knowingly and intelligently waive his *Miranda* rights is Defendant's own testimony that he was under the influence of alcohol

and NyQuil and unable to process what was happening. As in *Jones*, this comes down to a credibility issue, and as referenced above, the Court finds the testimony of Agent Weidlich and Officer Bisceglia to be credible and consistent with the recording of Defendant's interview while being unable to credit Defendant's testimony. In considering the totality of the circumstances, the Court must conclude that Defendant knowingly and intelligently waived his *Miranda* rights.

### b. Defendant's Voluntary Waiver of *Miranda* Rights

Having determined that Defendant's waiver of his *Miranda* rights was knowing and intelligent, the Court now turns its attention to the question of whether Defendant's waiver was made voluntarily. "[C]oercive police activity is a necessary predicate to finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The Sixth Circuit has established the following criteria for determining whether a statement was the result of coercion by law enforcement: "(i) whether the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). All three of these criteria must be satisfied to establish the existence of an involuntary statement due to coercion. *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003).

The totality of the circumstances is examined to determine "'whether a defendant's will was overborne in a particular case.'" *Id.* (quoting *Ledbetter*, 35 F.3d at 1067). Factors relevant to this determination may include "the defendant's age, education, and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Id.* at 423. When a defendant claims a statement or confession was the result of coercion, the Government bears the

burden of proving by a preponderance of the evidence that the statement or confession was indeed voluntary. *Johnson*, 351 F.3d 254 at 260.

Defendant claims that his *Miranda* waiver was involuntary because it was the result of immigration threats law enforcement made against his family members. During the hearing to address the instant Motion, Defendant testified that were it not for these threats he would have refused to speak to law enforcement at all. Defendant testified that an agent he believes was Officer Bisceglia stated that if he did not speak to law enforcement, they would have to look through his family's "papers and devices." Defendant testified that he interpreted this statement as a threat to have his family deported if he did not speak to law enforcement, which coerced him into involuntarily waiving his *Miranda* rights.

Defendant's age, education and intelligence were already addressed in the previous section. Likewise, it has been established that Defendant was advised of his constitutional rights prior to giving a statement and that the length of the interview was relatively brief. While Defendant was not provided with food during the interview, not providing Defendant with food during a roughly ninety-minute interview does not rise to the level of physical punishment. Further, the interviewing agents asked Defendant if he was "okay" during the interview and offered him the opportunity to take breaks. Defendant declined to take a break and did not ask for any food or beverages during the interview. [5] At no point during the interview did agents raise their voices or speak harshly with Defendant. The totality of these circumstances demonstrate that defendant had the ability to voluntarily waive his *Miranda* rights.

---

[5] In his Motion, Defendant alleges that he was sleep-deprived during the interview [Doc. 79, p. 5]; however, this allegation is not based on a claim that law enforcement deprived Defendant of sleep. Rather, Defendant's Motion alleges Defendant fell asleep at approximately 3:00 a.m. and was then awakened by law enforcement at approximately 6:00 a.m., resulting in Defendant's "sleep-deprivation."

Turning now to its analysis of the actions of law enforcement, the Court first addresses whether the actions of law enforcement were objectively coercive. As previously stated, the Court did not find Defendant's testimony to be credible; however, even if events unfolded as Defendant claims, the actions of law enforcement that Defendant described are not objectively coercive. First, Officer Bisceglia is a task force officer who specializes in forensics and does not work in immigration enforcement nor was any evidence introduced that Officer Bisceglia or anyone else identified him as an immigration agent. Further, according to Defendant's testimony, Officer Bisceglia did not specify that law enforcement would have to look through Defendant's family's *immigration* papers if he did not speak with them, only that law enforcement would have to look through the "papers and devices" of Defendant's family. Additionally, it is unlikely that searching the "devices" of Defendant's family members would be related to their immigration status. Given the nature of the charges brought against Defendant, a far more reasonable interpretation of such statements is that the papers and devices of Defendant's family members would be searched for evidence related to child pornography as opposed to any immigration purpose.

Moreover, even if objectively coercive activity by law enforcement was present, such coercion was insufficient to overbear Defendant's will. Defendant was not subjected to any physical punishments or threats, denied any physical necessities, and the interview was not unduly lengthy. *See Mahan*, 190 F. 3d. at 423 (holding that a three-and-a-half-hour interrogation was not unduly lengthy). Additionally, even if Defendant's testimony is taken as true, no direct threats regarding the immigration status or deportation of Defendant's family were made. Defendant never expressed any concern during his interview that law enforcement might be investigating the immigration status of his family but instead wanted to know if his family was receiving the same "interrogation" as was being directed toward him. Defendant's voice during his interview did not

indicate undue stress and as referenced above, Defendant making joking remarks to law enforcement during his interview. The Court cannot find that any condition related to the interview remotely indicates that Defendant's will was overborne. *See United States v. Adkins*, 169 F. App'x 961, 968 (6th Cir. 2006) (finding the defendant's will was not overborne where the interview lasted approximately eight-and-a-half hours, the defendant had been awake for 36 hours before the interview began, was of low intelligence, was not given *Miranda* warnings until the end of the interview and law enforcement falsely told defendant that her husband had already told them what they wanted to know).

Finally, the recording of Defendant's statement reflects that he explained his decision to waive his Miranda rights by voluntarily stating to the interviewing agents that it is "better to be honest." Additionally, Defendant volunteered information in addition to what was necessary to respond to the agents' questions and stated multiple times during the interview that he was willing to talk to them and inquired if there was anything else agents wanted to ask him. When considering the entirety of the circumstances, the Court concludes that none of the three necessary factors for establishing an involuntary statement as a result of coercive police action are satisfied. Thus, Defendant's statement was not the result of coercion or duress but was the result of a "free and rational choice" and a voluntary waiver of his *Miranda* rights. *See Mahan*, 109 F.3d at 423.

## IV. CONCLUSION

For the reasons outlined above, the undersigned RECOMMENDS that Defendant's Motion to Suppress [Doc. 79] be **DENIED**. [6]

Respectfully Submitted,

/s Cynthia Richardson Wyrick
United States Magistrate Judge

---

[6] Any objections to this report and recommendation must be served and filed by **July 2, 2021** and responses thereto must be served and filed by **July 6, 2021**. *See* Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987). Absent extraordinary circumstances, no extensions of the objection and response deadlines will be granted.